IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| JOSEPH S. CALDWELL, JR., | : | No. 30 MAP 2023 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 140 EDA 2022 |
| | : | dated October 5, 2022, Reversing |
| v. | : | the Order at No. 2021DR00484 |
| | : | dated December 3, 2021 of the |
| | : | Bucks County Court of Common |
| PHILIP P. JAURIGUE, | : | Pleas, Domestic Relations Division, |
| | : | and Remanding. |
| Appellant | : | |
| | : | ARGUED: November 30, 2023 |

## OPINION

**JUSTICE DOUGHERTY**                    **DECIDED: May 31, 2024**

The present appeal involves a dispute over child support between the child's biological father and the paramour of the child's deceased mother. We consider whether the Superior Court correctly viewed our decision in *A.S. v. I.S.*, 130 A.3d 763 (Pa. 2015), as requiring the paramour — who now has partial physical custody — to pay child support to father. For the following reasons, we hold the Superior Court erred in so holding, and reverse.

## I.      Background

Appellee Joseph Scott Caldwell (Father) and Jacqui Spencer (Mother) are the biological parents of L.C. (Child). Mother and Father never married, and Mother began a romantic relationship with appellant, Philip Jaurigue, while she was pregnant with Child. Child was born in March 2012, and in August 2013, Mother and Child began living with

Jaurigue. During this time, Mother had primary physical custody of Child, and Father had partial physical custody. This continued for more than six years, until Mother passed away in December 2019. Child then moved out of Jaurigue's home and went to live with Father. Jaurigue visited Child only when Father permitted, and those occasions ultimately became rare.

In June 2020, Jaurigue filed a complaint in custody claiming he stood *in loco parentis* to Child and seeking partial physical custody. *See* Complaint for Custody, 6/8/2020 at ¶14. Father filed preliminary objections and a motion to dismiss the custody complaint, arguing Jaurigue lacked standing. The court heard testimony, reviewed the parties' briefs, and overruled Father's preliminary objections to hold Jaurigue stood *in loco parentis* to Child and thus had standing to pursue custody. On March 22, 2022, after two more hearings, the trial court issued an order giving Father sole legal and primary physical custody, and Jaurigue partial physical custody. Jaurigue does not have any legal custody rights to Child.

However, Jaurigue's partial physical custody is relatively extensive: one weekend every even-numbered month; the second Saturday of odd-numbered months; the fourth Saturday every month; every Thursday after school; Saturdays on the weekends before Child's birthday, Easter, Father's Day, Thanksgiving, and Christmas; one day during Child's winter break; New Year's Day; and one week of summer vacation, which may include domestic air travel. *See* Custody Order, 3/22/2021 at 1-2 (unpaginated). The custody order also allows Jaurigue daily, private, fifteen-minute phone/FaceTime calls with Child on non-custodial days (which Father was to encourage) and text message exchanges once per day. *See id.* at 3 (unpaginated).

The custody order also requires that: Father contact Child's school to authorize Jaurigue as a person permitted to pick her up on his custodial days; Jaurigue shall be

notified and permitted to participate in and attend school events/activities and extracurriculars including fundraisers, school plays, concerts, shows, exhibits, volunteer events, gymnastics, dance, soccer, camp events, and religious activities and observances; Jaurigue provide all transportation for his custodial visits; Jaurigue be notified and allowed to participate in all of Child's current and future counseling, therapy, and tutoring (and that Father sign any required releases to permit such participation); and Father ensure Jaurigue has all of Child's medications for her custodial visits. *See id.* at 3-4 (unpaginated).

The custody order further mandates that Father and Jaurigue "shall make a concentrated effort to foster feelings of security, respect, and love in [Child] regarding the other party[.]" *Id.* at 4 (unpaginated). It prohibits the men from making any remarks or doing anything that could be "construed as derogatory or uncomplimentary to the other party[,]" and from discussing any litigation or court matters in Child's presence. *Id.* Finally, the custody order requires compliance with the notice obligations in 23 Pa.C.S. §5337 in the event of a qualifying change of residence. *See id.*

Father appealed, challenging the trial court's determination Jaurigue stood *in loco parentis* to Child. *See Jaurigue v. Caldwell*, No. 796 EDA 2021, 2021 WL 5293972, at *2 (Pa. Super., Nov. 15, 2021) (unpublished memorandum). The Superior Court affirmed the standing determination and Jaurigue's *in loco parentis* status, reasoning Father waived his claims because his brief failed to comply with the Pennsylvania Rules of Appellate Procedure. *See id.* at *2-3.

While that appeal was pending, Father filed a complaint seeking child support payments from Jaurigue. *See* Complaint in Child Support, 5/27/21 at 2 (unpaginated). Jaurigue filed preliminary objections, arguing, *inter alia,* Father failed to state a claim on which relief could be granted; Jaurigue relied on language from *A.S.* stating "*in loco*

*parentis* status alone and/or reasonable acts to maintain a post-separation relationship" with a child do not create a support obligation. Defendant's Preliminary Objections to Plaintiff's Complaint in Child Support, 7/23/21 at 4, *quoting A.S.*, 130 A.3d at 770. After briefing, the court sustained Jaurigue's preliminary objections and dismissed Father's support action.

Father timely appealed, arguing "the [t]rial [c]ourt erred in granting [Jaurigue's] Preliminary Objections and thereby dismissing [Father's] Complaint when [Jaurigue] has an obligation/duty to support the child pursuant to the law." Father's Rule of Appellate Procedure 1925(b) Statement of Matters Complained of on Appeal, 1/25/22 at 2.[1] The trial court explained in its Rule 1925(a) opinion that, under *A.S.*, Jaurigue had no obligation to support Child. *See Caldwell v. Jaurigue*, No. 2021DR00484, slip op. at 3 (C.P. Philadelphia, Jan. 25, 2022). The court elaborated that, per *A.S.*, "the mere existence of *in loco parentis* status is insufficient to establish a support obligation[,]" and that "reasonable acts to maintain a post-separation relationship with a child [are] insufficient to obligate someone [with] *in loco parentis* status to pay child support for that child." *Id.*, *citing A.S.*, 130 A.3d at 770.

The trial court further relied on *Commonwealth ex rel. McNutt v. McNutt*, 496 A.2d 816 (Pa. Super. 1985), where the Superior Court held an ex-stepparent's "continued love and devotion to his former stepchild" do not "carry with it the duty to financially support[.]" *Id.* at 4, *quoting McNutt*, 496 A.2d at 817. The *McNutt* court noted, "[i]f we were to hold that a stepparent acting *in loco parentis* would be held liable for support even after the

---

[1] Father also argued the trial court erred and abused its discretion by sustaining Jaurigue's preliminary objections without holding a hearing in violation of his due process rights. *See* Father's Superior Court Brief at 14-15. He claimed the question of whether a party owes support requires a fact intensive analysis regarding the nature and extent of the party's involvement in the child's life to determine whether a support obligation should attach. *See id.*

dissolution of the marriage then all persons who gratuitously assume parental duties for a time could be held legally responsible for a child's support. . . . These acts of generosity should not be discouraged by creating a law which would require anyone who begins such a relationship to continue financial support until the child is eighteen years old." *Id.*, *quoting McNutt*, 496 A.2d at 817. Here, the trial court likewise held "Jaurigue's 'past and continued love and devotion' to the minor child does not carry with it a duty to financially support." *Id.*, *quoting McNutt*, 496 A.2d at 817. The court emphasized that Jaurigue "never sought, and does not maintain, legal custody of the minor child[,]" and found it "clear" Jaurigue "filed a Complaint in Custody to seek visitation rights in order to maintain a relationship with the minor child after the death of Mother." *Id.*

A unanimous three-judge panel of the Superior Court reversed. *See Caldwell v. Jaurigue*, No. 140 EDA 2022, 2022 WL 5073906, at *1 (Pa. Super., Oct. 5, 2022) (unpublished memorandum). The court first acknowledged "*in loco parentis* status alone does not make a stepparent liable to financially support his stepchildren[,]" and that "a former stepparent's 'reasonable acts to maintain a post-separation relationship with stepchildren are insufficient to obligate a stepparent to pay child support for those children.'" *Id.* at *3, *quoting A.S.*, 130 A.3d at 770. "Critically, however," the court continued, "*A.S.* went on to recognize that there are some situations, such as the one in *A.S.*, where a former stepparent affirmatively takes sufficient legal steps to act as a parent so as to trigger an obligation to pay support." *Id.* at *4.

The panel recited the facts of *A.S.*, where the former stepfather of twins filed a custody complaint after his separation from the twins' mother. *See id.* The trial court ruled the former stepfather stood *in loco parentis* to the twins and awarded him shared physical and legal custody. *See id.* The twins' mother then filed an unsuccessful complaint for child support, and this Court ultimately reversed the decision, imposing a

support obligation on the ex-stepfather. *See id.* The panel below explained that despite the general rule that a former stepparent is not required to support his former stepchildren financially just because he makes efforts to maintain a relationship with them, the *A.S.* Court held the former stepfather owed a duty of support under the circumstances of that case. *See id.* The panel recited our reasoning in *A.S.,* where the ex-stepfather's efforts actually prevented the twins' mother from relocating with them:

> [T]he instant case involves a far greater assumption, indeed a relentless pursuit, of parental duties than that of a stepparent desiring a continuing relationship with a former spouse's children . . . Here, we have a stepfather who haled a fit parent into court, repeatedly litigating to achieve the same legal and physical custodial rights as would naturally accrue to any biological parent. This is not the 'typical case' of a stepparent who has grown to love his stepchildren and wants to maintain a post-separation relationship with them.

*Id.*, *quoting A.S.*, 130 A.3d at 770. The panel below then repeated our general statement in *A.S.* that "when a stepparent takes affirmative legal steps to assume the same parental rights as a biological parent, the stepparent likewise assumes parental obligations, such as the payment of child support." *Id.*, *quoting A.S.*, 130 A.3d at 765.

In the present matter, the Superior Court panel acknowledged, "the facts and circumstances here are less clear cut than those in *A.S.*" *Id.* It reasoned, however, that Jaurigue sought and obtained extensive custodial rights "after taking the initiative to file a custody complaint against Father." *Id.* The panel noted "it is clear that the custody schedule allows Jaurigue to have regular, consistent, and significant amounts of custody time with Child[,]" and further recognized under the other terms of the custody order, Jaurigue is permitted to spend significant time with Child outside his physical custody days. *Id.* at *4-5. The panel then "agree[d] with Father that Jaurigue's actions represent a proactive pursuit to assume parental duties of Child that would otherwise belong to Father[,]" "significantly intrud[ing] upon Father's full custody rights to Child." *Id.* at *5. It therefore held "[t]he amount of custodial time, along with the level of involvement in Child's

activities and life, goes well beyond the 'typical case' of a stepparent who wishes to maintain a relationship with a stepchild he has grown to love, which, under our case law, is insufficient to attach an obligation to support the stepchild." *Id.* "Instead," it held, this case is akin to *A.S.*, "where a stepparent has taken 'affirmative legal steps to assume the same parental rights as a biological parent.'" *Id.*, *quoting A.S.*, 130 A.3d at 765.

The Superior Court panel below distinguished *S.R.G. v. D.D.G.*, where a different three-judge panel declined to impose a support obligation on grandfather, who gratuitously accepted the burdens of partial physical and shared legal custody of his grandchild with the child's grandmother, whom he had divorced after agreeing to the custody order. *See id.*, *citing S.R.G. v. D.D.G.*, 224 A.3d 368 (Pa. Super. 2019). The panel below reasoned Jaurigue is not like the grandparent in *S.R.G.*, who gratuitously accepted the burdens of custody — he is a person akin to a stepparent who proactively filed a custody complaint against a fit biological parent. *See id.* at *5-6. Finally, the panel reasoned, its holding that Jaurigue was liable for child support did not undermine the policy considerations discussed in *McNutt*. Rather, it advanced those set forth in *A.S:* "[I]t is in the best interests of children to have stability and continuity in their parent-child relationships. By holding a person such as [the stepfather in *A.S.*] liable for child support, we increase the likelihood that only individuals who are truly dedicated and intend to be a stable fixture in a child's life will take the steps to litigate and obtain rights equal to those of the child's parent." *Id.* at *6, *quoting A.S.*, 130 A.3d at 771.

Jaurigue filed a petition for allowance of appeal, and we granted review on the following question: "Does the Court's holding in *A.S. v. I.S.*, 130 A.3d 763 (Pa. 2015), extend beyond the facts of that case and create child support obligations in third parties who seek and obtain custody rights less than those held by a biological parent?" *Caldwell v. Jaurigue*, 294 A.3d 306 (Pa. Mar. 21, 2023) (Table) (*per curiam*).

## II. Parties' Arguments

Jaurigue argues the Superior Court erred because *A.S.* does not extend beyond its own facts. He begins with the text of the child support statute, which provides only that "[p]arents are liable for the support of their children[.]" 23 Pa.C.S. §4321(2). Jaurigue argues he is not Child's "parent," so he cannot be held liable for support. He explains the Domestic Relations Code and the Statutory Construction Act do not include a definition of the word "parent," so the Court must employ the canons of statutory construction to ascertain its meaning.

Specifically, Jaurigue asserts the Court should read the **support** statute *in pari materia* with other closely related statutes, namely, the child **custody** statutes in Chapter 53 of the Domestic Relations Code. He recites that only certain individuals have standing to file an action for physical or legal custody: "(1) A parent of the child[;] (2) A person who stands *in loco parentis* to the child[;] (3) A grandparent of the child who is not *in loco parentis* to the child . . . [, and] (4) . . . [A]n individual who establishes by clear and convincing evidence [certain factors.]" 23 Pa.C.S. §5324. He compares this language to that of the support statute, and argues the General Assembly specifically distinguished between "parent," "person who stands *in loco parentis*," "grandparent," and other individuals for purposes of custody, making it notable that the support statute imposes obligations on "[p]arents" only, and not individuals in those other categories. *Id.*; 23 Pa.C.S. §4321(2).

According to Jaurigue, Pennsylvania law allows parentage to be established in four ways only: (1) biological paternity, (2) adoption, (3) the presumption of paternity, and (4) paternity by estoppel. *See* Jaurigue's Brief at 23, *citing* 23 Pa.C.S. §4343; *K.E.M. v. P.C.S.*, 38 A.3d 798, 806-11 (Pa. 2012); *and In re Davies' Adoption*, 46 A.2d 252, 257 (Pa. 1946). Thus, he argues, the General Assembly intended to limit support obligations

to those who are "parents" as defined in these four ways, and as opposed to nonparents, grandparents, or those acting *in loco parentis*. Jaurigue claims *A.S.* supports this interpretation, as it held an individual becomes a "parent" subject to support obligations when they obtain "all — not some — of the rights of parenthood equal to those of the child's biological or adoptive parent." *Id.* He argues the Superior Court's extension of *A.S.* below created a broad new doctrine of parentage where nonparents seeking to maintain any level of contact with a child may be required to pay support. He asserts this will lead to one of two results: either nonparents will be considered "parents" in the support statute and other related statutes (creating uncertainty in applying the custody statute, which distinguishes between the different types of parentage), or courts will have to draw arbitrary lines to distinguish when nonparents can be considered "parents."

Jaurigue argues Pennsylvania precedent makes clear nonparents cannot be held liable for child support absent extraordinary circumstances like those in *A.S.* He explains the *A.S.* Court adopted a line of Superior Court case law dating back to *McNutt* in 1985, which established that nonparents (such as stepparents) who voluntarily undertake to love and care for children should not be penalized by financial obligations. *See id.* at 26-28, *citing McNutt*, 496 A.2d at 817; *and Drawbaugh v. Drawbaugh*, 647 A.2d 240 (Pa. Super. 1994) (explaining Pennsylvania's policy of guarding a stepparent's right to visitation and rejecting the argument a stepfather owed a duty of support because he secured visitation rights).[2] Jaurigue asserts *A.S.* expressly preserved this general rule of non-support and carved only a narrow exception warranted to the specific facts of that case. He argues the Superior Court erred by applying *A.S.*'s fact-specific reasoning, as

_____

[2] Jaurigue was never married to Mother, so he was never Child's stepparent. But Jaurigue concedes in his Superior Court brief that his relationship with Child was "akin to that of a stepparent." Jaurigue's Superior Court Brief at 9. He also relies on cases like *McNutt* that involved stepparents. Thus, while Jaurigue is not technically a stepparent, we nonetheless consider those decisions where sufficiently analogous and applicable.

this case is analogous to *Drawbaugh* and the general rule should have applied to "jealously guard" Jaurigue's right to visitation even without a support obligation. *Id.* at 30.

Finally, Jaurigue argues the Superior Court's overly broad application of *A.S.* — that penalizes a nonparent for attempting to maintain a voluntary and limited relationship out of love and devotion — undermines Pennsylvania's public policy. *See id.* at 31. He notes the central question for all issues involving minor children is: what is in the child's best interests? He submits that for children with fewer than two biological parents, more adult engagement almost always benefits the child. According to Jaurigue, Pennsylvania courts have long recognized the importance of these relationships. *See id.* at 32-35, *citing McNutt*, 496 A.2d at 817 ("If we were to hold that a stepparent acting *in loco parentis* would be held liable for support even after the dissolution of the marriage then all persons who gratuitously assume parental duties for a time could be held legally responsible for a child's support. . . . These acts of generosity should not be discouraged by creating a law which would require anyone who begins such a relationship to continue financial support until the child is eighteen years old."); *Spells v. Spells*, 378 A.2d 879, 883 (Pa. Super. 1977) ("when a stepparent is '*in loco parentis*' with his stepchildren, courts must jealously guard his rights to visitation"); *and Commonwealth v. Rozanski*, 213 A.2d 155, 157 (Pa. Super 1965) ("The putative father may, in many instances, instill in the child a sense of stability. He may develop qualities in the child which the mother is uninterested, unwilling or incapable of developing. To the extent that he can perform such a valuable service, his presence becomes exceedingly important.").

Indeed, Jaurigue explains, the *A.S.* Court expressly based its holding on the same public policy "that it is in the best interests of children to have stability and continuity in their parent-child relationships." *Id.* at 35, *quoting A.S.*, 130 A.3d at 771. He claims the Superior Court's broad application of *A.S.* threatens to destabilize children who rely on

nonparents for emotional support. Further, Jaurigue argues, it creates practical issues. He posits the Superior Court's holding will cause biological parents who want money from third-party nonparents to withhold visitation from the nonparent, causing them to seek court intervention and exposing them to liability to pay child support. He also claims it creates questions about ongoing support obligations; here, if Father relocates or Jaurigue's visitation rights otherwise diminish, the parties will have to relitigate the nature of Jaurigue's relationship to Child to determine if he is a "parent" for support purposes. Thus, Jaurigue argues the Superior Court's broadening of *A.S.*'s narrow holding threatens to upend the stability and continuity children enjoy from nonparents like Jaurigue.

Father, on the other hand, argues it is in the best interests of children to impose a support obligation on non-biologically related individuals who stand *in loco parentis* to a child and affirmatively pursue significant custodial rights similar to those of a natural parent. He therefore requests the Court extend the principles supporting *A.S.* beyond the facts of that case. Father believes Jaurigue's reliance on custody statutes to define "parent" for purposes of the support statute is "misguided." Father's Brief at 3. Instead, he asserts *A.S.* requires reference to Pennsylvania case law to determine who is a "parent" for purposes of imposing a support obligation. He insists *A.S.* answered this question: "[w]hen a stepparent takes affirmative legal steps to assume the same parental rights as a biological parent, the stepparent likewise assumes parental obligations, such as the payment of child support." *Id.*, *quoting A.S.*, 130 A.3d at 765.[3]

Father acknowledges this case is factually distinct from *A.S.*, and that Jaurigue is not a stepparent because he never married Mother. But, he argues, *A.S.*'s holding still

---

[3] At oral argument, Father's counsel condensed this proposed rule into a three-prong test, asking whether: (1) there were sufficient affirmative steps (2) that the individual took to obtain substantial custodial rights (3) over the objection of a natural parent. *See* Oral Argument at 1:48:45, *Caldwell v. Jaurigue,* No. 521 MAL 2022 (Pa. Nov. 30, 2023), https://www.youtube.com/watch?v=u5ug-rMji7k.

applies to this case since "Jaurigue has not only sought out but also obtained parental rights identical to th[ose] of a biological parent." *Id.* at 4. Referring to the custody order, Father notes Jaurigue was awarded substantial physical visitation — which he calculates as Jaurigue having physical custody no less than 106 days each year, or approximately 29% of the days of the year — along with rights to communicate with Child and be involved in her extracurriculars, tutoring, and therapy on non-custodial days. He claims "Jaurigue is not merely maintaining a relationship with [Child]; he is actively parenting and raising [her]." *Id.* at 4. Thus, Father argues Jaurigue took "sufficient affirmative steps legally to obtain parental rights [and] should share in parental obligations, such as paying child support." *Id.* at 5, *quoting A.S.*, 130 A.3d at 770-71. He believes if Jaurigue's custodial rights are not comprehensive enough to be akin to those of a biological parent for purposes of *A.S.*, "few could ever meet such a threshold[.]" *Id.*

Father argues because Jaurigue affirmatively pursued and obtained these significant custodial rights to Child, he has a duty to support her. He repeats the public policy statement in *A.S.* that imposing support ensures only "individuals who are truly dedicated and intend to be a stable fixture in a child's life will take the steps to litigate and obtain rights equal to those of the child's parent." *Id., quoting A.S.*, 130 A.3d at 771. He highlights Jaurigue's own admission that, "[f]or the first six years of [Child's] life, Jaurigue assumed many parental duties, resulting in a close, parent-like relationship between the two, with [Child] referring to Jaurigue as 'Da.'" *Id.* at 6, *quoting* Jaurigue's Brief at 5-6. Father asserts "Jaurigue has been parenting the child since birth and now retains rights to, *inter alia*, attend parent-teacher conferences for the child, review sensitive medical information of the child, and partake in therapy with the child." *Id.*

Father pushes back against Jaurigue's characterizations of the custody litigation and that Jaurigue sought only partial physical custody. Father explains "partial physical

custody" is defined by 23 Pa.C.S. §5322(a) as "any amount of physical custody less than a majority of the time." *Id.* at 7. Father notes as a result of seeking "only" partial physical custody, Jaurigue was awarded significant visitation. Father further claims although he received sole legal custody, Jaurigue was effectively awarded a form of "quasi-legal" custody, as Father must now inform Jaurigue of all developments under the "legal umbrella," including school, medical, and religious matters. *Id.* Father reasons *A.S.*'s holding that a non-biological parent who takes "sufficient affirmative steps legally to obtain parental rights" owes a duty of support was not an "all or nothing" approach to be applied only in anomalous cases with identical facts. *Id.* at 8. He argues such an interpretation would exclude nonbiological parents who obtain 49% of custodial time as compared to the biological parent, against "whom they purposefully initiated litigation to secure **significant** legal rights." *Id.* at 8 (emphasis in original). Father theorizes this could lead to the manipulation of custody pleadings to avoid support obligations.

Finally, Father argues public policy, equity, and the best interests of Child require the Court to apply *A.S.*'s rationale to this case and mandate an award of child support. According to Father, Jaurigue did not pursue mere minimal contact to maintain a relationship with a former stepchild; he took affirmative legal steps to secure significant parenting rights to Child. Father asserts both the interests of Child and equity mandate Jaurigue cannot, on the one hand, obtain such comprehensive custodial rights over Father's objection, while on the other hand, deny Child's right to be supported financially. He rebuts Jaurigue's argument that applying *A.S.* to this case would destabilize children who rely on nonparents for emotional support, by arguing Jaurigue's position would lead to more custody litigation, where non-biological parents will aggressively pursue custodial rights just shy of the "arbitrary and unreasonably high threshold suggested by Jaurigue." *Id.* at 9. This, he argues, would be contrary to the law and public policy of the

Commonwealth, allowing a "willful abandonment . . . of all obligations to financially stabilize the child[.]" *Id.*

Jaurigue replies that he does not have rights "identical" to a biological parent as Father claims, since the custody order granted him only partial physical custody and not any form of legal custody. Jaurigue's Reply Brief at 3, *quoting* Father's Brief at 2, 4. He argues the distinction between the two is significant, noting "partial physical custody" is the "right to assume physical custody of the child for less than a majority of the time[,]" while "legal custody" is the "right to make major decisions on behalf of the child, including, but not limited to, medical, religious, and educational decisions." *Id.* at 3, *quoting* 23 Pa.C.S. §5322(a). Jaurigue insists a person with only partial physical custody "has no right whatsoever to make any substantial decisions regarding the child's life." *Id.* at 4.

Jaurigue further argues Father inaccurately portrays the custody order as giving Jaurigue something more than partial physical custody. He counters Father's calculation of physical custodial time (29%), noting that in terms of hours, Jaurigue is allowed only 10% of the hours in a year. Jaurigue further argues that since Pennsylvania's support guidelines quantify custody in terms of custodial overnights, the appropriate measure is determined by totaling the number of possible overnights — and Jaurigue has only 5% of the nights each year. He clarifies he does not have a right to attend parent-teacher conferences or review sensitive medical information as Father claims. *See id.* at 5. Most importantly, Jaurigue emphasizes, since he does not have legal custody, he does not have the authority to make decisions over Child's life — he cannot decide to baptize her, make decisions about her schooling, authorize vaccinations or other medical decisions, get her ears pierced, etcetera. Thus, he argues, unlike the ex-stepfather in *A.S.*, he simply does not have rights "identical" to a biological parent.

Next, Jaurigue contends *A.S.* created a bright-line rule for rare circumstances where a nonparent has obtained "all the rights of parenthood" — including legal custody. *Id.* at 8. He claims Father takes language in *A.S.* out of context to argue legal custody is not required to trigger the exception in *A.S.* and that a nonparent has a duty to pay child support if he takes general "sufficient affirmative steps legally to obtain parental rights." *Id.* at 9. Instead, Jaurigue argues, this language was cabined to apply only to the facts of *A.S.*, where the ex-stepfather "litigated and obtained full legal and physical custody rights . . . [and] has insisted upon and bec[o]me a full parent in every sense of that concept." *Id.*, *quoting A.S.*, 130 A.3d at 770 ("We find that **under these facts**, Stepfather has taken sufficient affirmative steps legally to obtain parental rights and should share in parental obligations, such as paying support.") (emphasis provided by Jaurigue). Jaurigue stresses he did "the least amount possible" to "maintain a regular, stable relationship with the child he had already grown to love." *Id.* at 10.

Lastly, Jaurigue asserts Father's sliding-scale approach to applying *A.S.* would be contrary to the public policy accepted by the Court in that case: that nonparent involvement in the life of the nonbiological children with whom they are bonded is critical to the child's development and should be "jealously guarded." *Id.* at 12-13, 16, *quoting Spells*, 378 A.2d at 883. Jaurigue claims Father's approach undermines the third parties' right to visitation and would incentivize biological parents to leverage custody to receive funding from *in loco parentis* nonparents. *See id.* at 15. He further argues Father's approach would penalize nonparents for seeking visitation in violation of Pennsylvania's public policy. Thus, Jaurigue asks us to reverse the Superior Court's decision.

### III. Discussion

Whether someone like Jaurigue — a deceased parent's paramour who, after establishing *in loco parentis* standing to seek custody of a child, sought and obtained

extensive physical, but not legal, custody — owes a duty to pay child support under 23 Pa.C.S. Section 4321 as construed by *A.S.* is an issue of first impression. This issue presents a legal question: in broad terms, whether someone in Jaurigue's position is a "parent" for purposes of Section 4321. As such, our standard of review is *de novo* and our scope of review is plenary. *See A.S.*, 130 A.3d at 768.

The child support statute in Section 4321(2) provides: "Subject to the provisions of this chapter: . . . **[p]arents** are liable for the support of their children who are unemancipated and 18 years of age or younger." 23 Pa.C.S. §4321(2) (emphasis added). As we acknowledged in *A.S.*, Section 4321 is the statute "from which all child support obligations are derived." 130 A.3d at 768. Notably, however, the support statute does not define the term "parent." We must therefore look to our canons of statutory interpretation to determine if Jaurigue is a "parent" for purposes of the support statute. *See* 1 Pa.C.S. 1901 *et seq.*

As always, our analysis must be grounded in the text of the statute to ascertain and effectuate the intention of the General Assembly. *See* 1 Pa.C.S. §1921. Specifically, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa.C.S. §1903(a). While dictionary definitions are not dispositive to our statutory interpretation, *see, e.g.*, *Whitmoyer v. Workers' Compensation Appeal Board (Mountain Country Meats)*, 186 A.3d 947, 955 (Pa. 2018), they can provide a good starting point. Merriam-Webster's dictionary defines the noun "parent" as "one that begets or brings forth offspring[; or] a person who brings up and cares for another." *Parent* (1), MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/parent (last visited Feb. 12,

2024). Apparent from this definition is that "parent" can encompass biological and non-biological relationships, but for those with a non-biological connection, further responsibilities must be attendant to the relationship — they must both "bring[] up **and** care[] for" the child. *Id.* (emphasis added).[4]

Similarly, Black's Law Dictionary provides a definition of "parent" that is not limited to those with a biological or adoptive relationship:

> **parent** (15c) 1. The lawful father or mother of someone. In ordinary usage, the term denotes more than responsibility for conception and birth. The term commonly includes (1) either the natural father or the natural mother of a child, (2) either the adoptive father or the adoptive mother of a child, (3) a child's putative blood parent who has expressly acknowledged paternity, and (4) an individual or agency whose status as guardian has been established by judicial decree. In law, parental status based on any criterion may be terminated by judicial decree. In other words, a person ceases to be a legal parent if that person's status as a parent has been terminated in a legal proceeding. — Also termed *legal parent*.

*Parent*, BLACK'S LAW DICTIONARY (11th ed. 2019) (providing related definitions for a variety of different types of "parent," including "adoptive parent," "biological parent," "de facto parent," "equitable parent," and "psychological parent").

And although the legislature has not given us a definition of "parent" in the support statute, Section 1991 of the Statutory Construction Act provides a definition of "children." *See* 1 Pa.C.S. §1991 ("The following words and phrases, when used in any statute finally enacted on or after September 1, 1937, unless the context clearly indicates otherwise,

---

[4] Helpfully, Merriam-Webster also defines the phrases that make up this definition. It defines "bring up" (in relevant part) as "to bring (a person) to maturity through nurturing care and education[.]" *Bring up* (1), MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/bring%20up (last visited Feb. 12, 2024). It also defines the phrasal verb "care for" (in relevant part) as "to do the things that are needed to help and protect (a person or animal): look after (someone or something)." *Care for* (1), MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/care%20for (last visited Feb. 12, 2024). From these definitions, it appears "bring up," as used in the "parent" definition, refers more to the long-term childrearing involved with raising a child, while "care for" implicates more day-to-day responsibilities of ensuring safety and supervision.

shall have the meanings given to them in this section . . ."). According to Section 1991, "[c]hild" or "children" "[i]ncludes children by birth or adoption." *Id.* Like the above definitions of "parent," this statutory definition of "children" extends beyond biological relationships, explicitly including "children by . . . adoption." *Id.* Facially, however, this definition is somewhat stringent. Although the use of the word "[i]ncludes" suggests the definition of "children" extends beyond "children by birth or adoption[,]" *id.*, the *ejusdem generis* canon of statutory construction teaches that other "children" falling within the definition must be of the same general class or nature. *See*, *e.g.*, *Dep't of Env't Prot. v. Cumberland Coal Res., LP*, 102 A.3d 962, 976 (Pa. 2014) ("the presence of such a term as 'including' in a definition exhibits a legislative intent that the list that follows is not an exhaustive list of items that fall within the definition; yet, any additional matters purportedly falling within the definition, but that are not express, must be similar to those listed by the legislature and of the same general class or nature"). The statute's examples of what is "include[d]" by the term "children" — those "by birth or adoption" — certainly suggest the requirement of an extremely strong legal relationship between the "parent" and the "child."[5]

In harmony with these definitions, Pennsylvania case law has developed to acknowledge parentage (and concomitant support obligations) beyond cases of biological or adoptive parents. *See A.S.*, 130 A.3d at 768-69. We explained in *A.S.* that in those non-biological, non-adoptive situations, "courts have looked to whether a nonparent has taken affirmative steps to act as a legal parent so that he or she should be treated as a legal parent." *Id.* at 769, *citing K.E.M.*, 38 A.3d 798 (reaffirming paternity by estoppel

---

[5] Unlike the support chapter of the Domestic Relations Code, the custody chapter provides its own specific definition of "[c]hild." *See* 23 Pa.C.S. §5322(a) ("'Child.' An unemancipated individual under 18 years of age."). Our analysis here does not disturb that more specific definition designated by the General Assembly for custody matters.

doctrine, but holding it applies only where it serves the best interests of the child); *Fish v. Behers*, 741 A.2d 721 (Pa. 1999) (estopping mother from seeking support from her paramour/child's biological father where she and her husband held the child out as the husband's); *L.S.K. v. H.A.N.*, 813 A.2d 872 (Pa. Super. 2002) (imposing support obligation on non-biological mother who agreed to start a family with her same-sex partner — the biological mother — where both partners acted as mothers to the children and the non-biological mother obtained legal and physical custodial rights after their separation based on *in loco parentis* standing); *Hamilton v. Hamilton*, 795 A.2d 403 (Pa. Super. 2002) (non-biological former stepfather who held himself out as child's father was subject to support obligation under paternity by estoppel doctrine).[6]

As we acknowledged in *A.S.*, however, another line of cases limits the extension of parenthood where former stepparents simply seek to maintain a relationship with their stepchildren. Preliminarily, in *Spells*, the Superior Court held a former stepparent may be entitled to visitation rights if he or she stood *in loco parentis* to the stepchild. *See* 378 A.2d at 881-82. The court emphasized the benefit of allowing such relationships to continue after divorce, noting the value to the child of maintaining a stable relationship with the nonparent. *See id.* at 883.

Then in *McNutt*, the Superior Court reversed a trial court order requiring a former stepfather to pay support for his former stepdaughter. *See* 496 A.2d at 817-18. In that case, the stepfather married the stepdaughter's mother when the child was two months old. *See id.* at 816. The stepfather and mother had a child together during their marriage,

---

[6] These decisions involved claims of estoppel. In *Fish*, we explained paternity by estoppel "is merely the legal determination that because of a person's conduct (*e.g.*, holding out the child as his own, or supporting the child) that person, regardless of his true biological status, will not be permitted to deny parentage, nor will the child's mother who has participated in this conduct be permitted to sue a third party for support, claiming that the third party is the true father." 741 A.2d at 723, *quoting Freedman v. McCandless*, 654 A.2d 529, 532-33 (Pa. 1995).

and the stepfather considered adopting the stepdaughter but never proceeded with the adoption. *See id.* at 817. After the stepfather and mother divorced, he continued to visit both children and the stepdaughter continued to call him "Daddy." *See id.* The trial court found the stepfather stood *in loco parentis* to the stepdaughter, and on that basis alone held he was liable to support her. *See id.* In reversing, the Superior Court explained the stepfather's "past and continued love and devotion to his former stepchild [did not] carry with it the duty to financially support [her, and that t]his would be carrying the common law concept of *in loco parentis* further than we are willing to go." *Id.* (footnote omitted). Holding "[t]he general rule is that no legal duty rests upon the stepparent to support after termination of the marriage[,]" the court explained its rationale:

> If we were to hold that a stepparent acting *in loco parentis* would be held liable for support even after the dissolution of the marriage[,] then all persons who gratuitously assume parental duties for a time could be held legally responsible for a child's support. . . . . These acts of generosity should not be discouraged by creating a law which would require anyone who begins such a relationship to continue financial support until the child is eighteen years old.

*Id.* The Superior Court reaffirmed these principles three years later in *DeNomme v. DeNomme*, holding "[b]ecause the policy is to encourage gratuitous assumption of responsibility by stepparents, courts are reluctant to extend the duty of support beyond marriage. The general proposition derived from this public policy is that, after divorce, no legal duty rests upon the stepparent." 544 A.2d 63, 65 (Pa. Super. 1988); *see also Garman v. Garman*, 646 A.2d 1251, 1253 (Pa. Super. 1994) ("This court desires to encourage the generous actions of step-parents. . . . We might encourage the opposite effect by using a technical approach to support law and holding a step-parent responsible following separation for support of a child who was not adopted by that step-parent.").

Then, in *Drawbaugh*, the Superior Court applied these principles where a former stepfather sought court-ordered visitation with his former stepchildren. *See* 647 A.2d at

242-43. In that case, the stepfather began residing with the mother and her two children when the children were very young. *See id.* at 240. The stepfather and mother married, and together they provided food, clothing, shelter, and medical care for the children. *See id.* The stepfather was involved in childrearing, and the children referred to him as "dad." *See id.* After ten years of living together and six years of marriage, the mother filed for divorce and stopped all contact between the stepfather and the children. *See id.* The stepfather filed a petition for minimal visitation with the two children, which the trial court granted. *See id.* The mother subsequently filed a complaint for support, which the trial court also granted after concluding the stepfather stood *in loco parentis* to the children. *See id.* at 241.

Reversing the trial court, the Superior Court "beg[a]n with the general rule that a stepparent has no legal obligation to support his or her stepchild." *Id.*, *citing*, *inter alia*, *DeNomme*, 544 A.2d 63. It further acknowledged "a stepfather who lives with his wife and her natural children may assume the relationship of *in loco parentis*." *Id.*, *citing* *Spells*, 378 A.2d 879. But, it noted, *Spells* did not involve child support — it held only that an *in loco parentis* former stepfather should be permitted visitation. *See id.* at 242. Instead, and in line with *McNutt*, the court explained "it appears that no appellate case in Pennsylvania has imposed a duty of support on a stepparent, even one who stands *in loco parentis* to his stepchildren, following the dissolution of the parties' marriage, absent a written agreement to assume such obligation." *Id.* Thus, it held:

> [A]s in *McNutt*, [s]tepfather should not be penalized for having provided both financial and emotional support to his stepchildren for the past ten years. Although [s]tepfather sought visitation rights, to which he is entitled on this record, *Spells v. Spells*, *supra.*, and clearly loves and cares about his stepchildren, it was an abuse of discretion to hold him legally responsible for their support.

*Id.* at 243.

Most recently, in *A.S.*, this Court approved of the Superior Court's rule generally precluding former stepparents from support obligations, but we carved out a narrow exception to address the nuanced facts of that case. As noted above, in *A.S.*, the mother of twin sons was divorced from their former stepfather (with whom they maintained a relationship), when she decided to relocate with the twins to California. *See* 130 A.3d at 765. The stepfather filed a complaint for custody of the twins and an emergency petition to prevent the relocation, claiming *in loco parentis* status for standing to seek custody. *See id.* The trial court granted the emergency petition, and the stepfather continued to litigate vigorously for custody rights to the children. *See id.* After full custody proceedings, the trial court entered a custody order granting the parties **shared legal and physical custody**. *See id.*

During the pendency of the custody litigation, the mother filed a complaint for child support against the stepfather. *See id.* at 766. The lower courts held the stepfather did not owe a financial support obligation, citing the above Superior Court case law (*e.g.*, *McNutt*, *Garman*, and *Drawbaugh*) establishing that stepparents are generally not liable for child support after dissolution of the marriage. *See id.* The mother appealed to this Court, arguing that notwithstanding the general rule, the Court should hold the stepfather had a support obligation because he pursued and obtained parental custody rights equal to hers, the twins' natural parent. *See id.* at 767. We agreed.

We began our analysis by looking at the text of the support statute, providing that "[p]arents are liable for the support of their children[.]" *Id.* at 768, *quoting* 23 Pa.C.S. §4321. We rejected the parties' suggestions that we adopt the definition of "parent" used in other statutes and instead assessed the meaning of "parent" as used in the support statute according to the development of our case law. *See id.* We identified that on the one hand, Pennsylvania case law establishes the term "parent" for support purposes

encompasses more than biological and adoptive parents, and that "courts have looked to whether a nonparent has taken affirmative steps to act as a legal parent so that he or she should be treated as a legal parent." *Id.* at 769 (relying on *Fish*, *Hamilton*, *N.E.M.*, and *L.S.K.*). On the other hand, however, we acknowledged support obligations have not been extended to stepparents that do not take sufficient affirmative steps to act as a child's parent. *See id.* at 770 (relying on *McNutt*, *DeNomme*, *Garman*, and *Drawbaugh*).

Considering these two lines of cases, we initially reaffirmed the general principle that "*in loco parentis* status alone and/or reasonable acts to maintain a post-separation relationship with stepchildren are insufficient to obligate a stepparent to pay child support for those children." *Id.* We held, however, "the instant case involves a far greater assumption, indeed, a relentless pursuit, of parental duties than that of a stepparent desiring a continuing relationship with a former spouse's children[.]" *Id.* We distinguished *McNutt* and its progeny, explaining "[h]ere, we have a stepfather who haled a fit parent into court, repeatedly litigating to achieve the same **legal and physical custodial rights** as would naturally accrue to any biological parent. . . . Stepfather in the instant case has litigated and obtained **full legal and physical custody rights**, and has also asserted those parental rights to prevent a competent biological mother from relocating with her children." *Id.* (emphasis added). Because the ex-stepfather "insisted upon and became a **full parent in every sense** of that concept[,]" we held he had "taken sufficient affirmative steps legally to obtain parental rights and should share in parental obligations, such as paying child support." *Id.* at 770-71 (emphasis added).

Although this was the first time we held a former stepparent could be liable for child support under such circumstances, we emphasized we were "not creating a new class of stepparent obligors" and that our holding comported with the principle that "*in loco parentis* standing alone is insufficient to hold a stepparent liable for support." *Id.* at 771.

We reaffirmed the public policy of "encouraging stepparents to love and care for their stepchildren[,]" but we clarified that "when a stepparent does substantially more than offer gratuitous love and care for his stepchildren, when he instigates litigation to achieve **all the rights of parenthood** at the cost of interfering with the rights of a fit parent, then the same public policy attendant to the doctrine of paternity by estoppel is implicated: that it is in the best interests of children to have stability and continuity in their parent-child relationships." *Id.* (emphasis added). We explained our holding "increase[d] the likelihood that only individuals who are truly dedicated and intend to be a stable fixture in a child's life will take the steps to litigate and obtain rights equal to those of the child's parent." *Id.*

Applying the plain text of Section 4321 and the above case law to the facts of the present case, we hold Jaurigue is not a "parent" obligated to pay child support. Principally, we hold as a matter of law Jaurigue does not fit into the class of third-parties obligated to pay support pursuant to the rule announced in *A.S.* because **he does not have legal custody of Child.** He has partial physical custody only, which, although rather extensive, is akin to the visitation rights obtained by the former stepfather in *Drawbaugh*. *See Drawbaugh*, 647 A.2d at 243. As we held in *A.S.*, "*in loco parentis* status alone and/or [such] reasonable acts to maintain a post-separation relationship with stepchildren are insufficient to obligate a stepparent to pay child support for those children." *A.S.*, 130 A.3d at 770.

For context, our Domestic Relations Code provides definitions for the various types of child custody. Relevantly, legal custody is defined as "[t]he right to make major decisions on behalf of the child, including, but not limited to, medical, religious and educational decisions." 23 Pa.C.S. §5322. By contrast, physical custody is "[t]he actual physical possession and control of a child[,]" and partial physical custody is "[t]he right to

assume physical custody of the child for less than a majority of the time." *Id.*[7] It is possible for parties to have shared legal custody — "[t]he right of more than one individual to legal custody of the child." *Id.* Indeed, that was the case in *A.S.* But in this case, Father has sole legal custody, or "[t]he right of one individual to exclusive legal custody of the child." *Id.* This means that Father, and Father **alone**, has the "right to make major decisions on behalf of [C]hild[.]" *Id.*

Without this right to make such major decisions on Child's behalf, Jaurigue is simply not a "parent" for purposes of Section 4321. He does not have "all the rights of parenthood." *A.S.*, 130 A.3d at 771; *see also id.* at 770-71 (holding the stepfather subject to support obligation where he "litigated and obtained full legal and physical custody rights" and "insisted upon and became a full parent in every sense of that concept"). Even under the simple dictionary definitions of "parent" offered above, Jaurigue does not seem to fit. Although he has opportunity to "care for" Child, it is doubtful he is "bring[ing her] up." *See Parent* (1), Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/parent (last visited Feb. 12, 2024); *supra* note 4. And under Black's Law Dictionary's definition, he is not Child's "lawful father or mother." *Parent*, Black's Law Dictionary (11th ed. 2019). Even under that definition's non-biological and non-adoptive examples — *i.e.,* "a child's putative blood parent who has expressly acknowledged paternity" and "an individual or agency whose status as guardian has been established by judicial decree" — Jaurigue is still not a "parent" for purposes of the support obligation. *Id.*

---

[7] Notably, Section 5322 also provides: "In a statutory provision other than in this chapter, when the term 'visitation' is used in reference to child custody, the term may be construed to mean: (1) partial physical custody; (2) shared physical custody; or (3) supervised physical custody." 23 Pa.C.S. §5322(b).

As noted, dictionary definitions are not dispositive to the plain meaning of a statutory term. But certainly, the definition of "children" provided in the Statutory Construction Act sheds critical light on whether Jaurigue is a "parent" for purposes of Section 4321. *See* 23 Pa.C.S. §4321(2) ("**Parents** are liable for the support of **their children** who are unemancipated and 18 years of age or younger.") (emphasis added). It is difficult to see how Child could be Jaurigue's "child" under that statutory definition, which "[i]ncludes children by birth or adoption." 1 Pa.C.S. §1991. As stated above, while we recognize the word "[i]ncludes" suggests the definition might extend beyond biological and adopted children, any "child" fitting into the definition must be of that same general class or nature under the *ejusdem generis* canon of construction. We again stress the strength of the **legal** relationship between parents and their biological or adopted children. Indeed, absent court intervention, such parents enjoy the full panoply of parental rights to their children, or what the *A.S.* Court referred to as "all the rights of parenthood." *A.S.*, 130 A.3d at 771. Here, where Jaurigue does not have legal custody of Child, that is, where he cannot participate in making major decisions about her life, their relationship is simply not of the same general class or nature as those recognized in Section 1991's definition of "children."

Moreover, while there are a handful of Pennsylvania cases imposing a support obligation on a non-biological, non-adoptive parent figure, those holdings should be narrowly construed based on their specific facts. For instance, in the context of support obligations found by way of paternity by estoppel, the non-biological parents had stepped fully into the role of "parent." In *Hamilton*, the Superior Court explained the non-biological father had held the child out as his own and that he was "the only father the [c]hild ha[d] ever known." *Hamilton*, 795 A.2d at 406. It was because of these circumstances, where

the non-biological father "never told the [c]hild he was not her father[,]" that *Hamilton* fit squarely within the concept of paternity by estoppel articulated in *Fish*:

> Estoppel is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father.

*Fish*, 741 A.2d at 724 (citation omitted). And this Court ensured narrow adherence to that policy in *K.E.M.* when we held paternity by estoppel should be applied only where it actually serves the child's best interests. *See K.E.M.*, 38 A.3d at 810. Thus, a non-biological, non-adoptive third-party assumes a financial support obligation by way of estoppel only where they have assumed parenthood in all other respects by holding themselves out and acting as the child's parent **and** where it is in the child's best interests.

To be sure, the decision in *A.S.* was similarly narrow and explicitly supported by the same policy considerations as the paternity by estoppel doctrine. We emphasized that case did "not creat[e] a new class of stepparent obligors." *A.S.*, 130 A.3d at 771. We specifically reiterated "*in loco parentis* standing alone is insufficient to hold a stepparent liable for support" and that the "public policy behind encouraging stepparents to love and care for their stepchildren remains just as relevant and important today as it was when *Drawbaugh* was decided." *Id.* We held only that a former stepparent achieves the status of "parent" for purposes of support under Section 4321 — without the ties of biology, adoption, or a legal doctrine like paternity by estoppel — when he "does substantially more than offer gratuitous love and care for his stepchildren, when he instigates litigation to achieve **all the rights of parenthood** at the cost of interfering with the rights of a fit parent[.]" *Id.* (emphasis added). Considering that particular ex-stepfather's **full** assumption of parental rights, we reasoned "the same public policy attendant to the

doctrine of paternity by estoppel is implicated: that it is in the best interests of children to have stability and continuity in their parent-child relationships." *Id.*

Here, where Jaurigue does not have the right to make the major, long-term decisions that will impact Child's life for years to come, the stability and continuity policy concerns are, frankly, less imperative than in *A.S.* or the paternity by estoppel cases. Instead, the paramount policy consideration in this case is that expressed in *McNutt* and *Drawbaugh*:

> If we were to hold that a stepparent acting *in loco parentis* would be held liable for support even after the dissolution of the marriage then all persons who gratuitously assume parental duties for a time could be held legally responsible for a child's support. . . . These acts of generosity should not be discouraged by creating a law which would require anyone who begins such a relationship to continue financial support until the child is eighteen years old.

*McNutt*, 496 A.2d at 817; *Drawbaugh*, 647 A.2d at 242. This is not to say adults like Jaurigue cannot (or should not) be stable fixtures in the lives of the children they love. In fact, as expressed by *McNutt* and *Drawbaugh*, our policy is to encourage continuation of these relationships. But without the power to decide the monumental facets of a child's life such as their medical treatment, religion, or course of education, the non-parent's role is plainly subordinate to that of a parent.[8]

Thus, although our case law has evolved in this area, our decision here may not be unmoored from the text of the statute. Under Section 4321(2), child support obligations fall on "parents" only. It is true these obligations may attach to individuals without a biological or adoptive parental tie in certain situations, but Jaurigue, who does not even

---

[8] In fact, it could likely be inequitable to require a third-party without legal custody to pay support to fund major life decisions, while having no say in making those decisions. For example, if the third-party was an atheist but the parent with sole legal custody was Christian and decided the child should attend a parochial school, why should the third-party be forced to pay for the schooling without having any say in that decision?

have legal custody, does not fall into that category.[9]  Our law recognizes that the concept of a "parent" is somewhat elastic and sometimes extends beyond biological or adoptive ties.  But applying the term, with its concomitant statutory support obligation, to Jaurigue under these circumstances would stretch the term too far.

## IV.    Conclusion

For the reasons above, we reverse the order of the Superior Court, and remand for the entry of an order consistent with this opinion.

Chief Justice Todd and Justices Donohue, Wecht, Mundy and Brobson join the opinion.

Justice Wecht files a concurring opinion.

---

[9] Our reasoning here is specific to the type of adult-child relationship presented in this case.  Nothing in this opinion displaces the well-established support obligations of biological or adoptive parents, even where they do not have legal custody of their children.  *See, e.g.*, *Oeler by Gross v. Oeler*, 594 A.2d 649, 651 (Pa. 1991) ("the duty to support a minor child is absolute"); *Conway v. Dana*, 318 A.2d 324, 326 (Pa. 1974) ("Support, as every other duty encompassed in the role of parenthood, is the equal responsibility of both mother and father.").  Further, in accordance with the distinctions made above, this holding does not speak to cases where parentage is otherwise established for support purposes by common law doctrines such as parentage by estoppel.  *See, e.g.*, *L.S.K.*, 813 A.2d 872; *Hamilton*, 795 A.2d 403.  Finally, our decision is limited to the child support context.  While there is certainly overlap between "parents" for purposes of standing in custody disputes, *see* 23 Pa.C.S. 5324(1), and "parents" for purposes of support, we do not hold the two are identical in all cases.  *Cf. A.S.*, 130 A.3d at 765, 770 (holding stepfather had a duty to support where he "insisted upon and became a full parent in every sense of that concept[,]" but did so by asserting *in loco parentis* standing at the custody phase of the litigation).